[Cite as *State ex rel. Patrick Bros., A Gen. Partnership v. Putnam Cty. Bd. of Commrs.*, 2014-Ohio-2717.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PUTNAM COUNTY

STATE EX REL. PATRICK BROTHERS,
A GENERAL PARTNERSHIP, ET AL.,

    PLAINTIFFS-APPELLANTS,            CASE NO.  12-13-05

    v.

BOARD OF PUTNAM COUNTY             O P I N I O N
COMMISSIONERS, ET AL.,

    DEFENDANTS-APPELLEES.

**Appeal from Putnam County Common Pleas Court**
**Trial Court No. 2012 CV 00055**

**Judgment Reversed and Cause Remanded**

**Date of Decision:  June 23, 2014**

APPEARANCES:

    *Linde Hurst Webb and Daniel T. Ellis* **for Appellants,**
        **Patrick Brothers, et al.**

    *Matthew A. Cunningham*  **for Appellant, Buckeye Stave Company**

    *Brian W. Fox and Frank J. Reed*  **for Appellees, Putnam**
        **County Commissioners**

Case No. 12-13-05

**WILLAMOWSKI, P.J.**

{¶1} Plaintiffs-Appellants Patrick Bros., a Gen. Partnership, Mary Lou Patrick, Patrick Holdings Inc., Thomas Patrick ("Patrick"), William R. Weis, Mark G. Maag, Robert E. Niese, Albert J. Nienberg, Carol Reynolds, Meredith John, Mark Nienberg, Marilyn Horstman ("Horstman"), Marcia Stanton, Michael Nienberg, James Nienberg, John Nienberg, Ann Neff Nienberg, and Buckeye Stave Co. ("Buckeye"), collectively known as "Appellants", bring this appeal from the judgment of the Court of Common Pleas of Putnam County, denying their complaint for declaratory judgment. The trial court found in favor of Defendants-Appellees Board of Putnam County Commissioners ("the Board"), John Love ("Love"), Travis Jerwers ("Jerwers"), and Vince Schroeder ("Schroeder"), collectively known as "Appellees". For the reasons set forth below, the judgment is reversed.

*Historical Background*

{¶2} The Road 5 project began in the 1990's. Terrence R. Recker ("Recker") Dep., 73. At that time, a private group known as the Stakeholder Committee[1], was formed to look into the advantages of providing access from Interstate 75 to the industrial park. *Id*. at 23. The Committee studied the best, most cost-efficient route for traffic to get to the industrial park from the interstate.

---

[1] The Committee was made up of various business owners, but did not include any people owning land along Road 5. Recker Dep., 110.

-2-

*Id.* at 75.  In November of 1999, the Putnam County Engineer's office entered into an agreement with Poggemeyer Design Group ("Poggemeyer") to perform a feasibility study.  *Id.* at 73-74.  The Commissioners in office at that time had applied for a grant to pay for the expansion with the grant stating that the purpose of the road improvements was to improve the economic welfare of the area and increase employment opportunities by improving transportation to the industrial park.  *Id.* at 79-81.  The preliminary feasibility study with various alternatives, including the expansion of Road 5, was submitted to the Commissioners on August 23, 2000.  *Id.* at 82.  The report indicated that trucks preferred to use Road 5 because that route was faster.  *Id.* at 141.  In October of 2000, the Committee selected State Route 696, State Route 12, and County Road 5 as feasible alternatives.  *Id.* at 90.

{¶3}  In January of 2003, the Commissioners entered into an agreement with Poggemeyer to create plans for the widening of Road 5.  *Id.* at 103.  No resolution to enter the contract was passed, but two of the three commissioners at that time signed the contract.  *Id.* at 104-105.  As the project was progressing, various issues were addressed, including the lack of records concerning the right-of-way along sections of Road 5.  Jerwers Dep., 53-54.  Appellees were made aware in 2009 that the County could not find any record that it owned a complete right-of-way along Road 5.  Tr. Vol. I, 37.

{¶4} In February of 2011, a revenue line of $500,000 was sought by the Engineer's Office to conduct appraisals on the property adjoining Road 5, to pay the owners for the property, and to pay Poggemeyer for the completed plans. Recker Dep., 112-13. Appellees hired Mannik & Smith in 2011 to acquire property for the county. *Id*. at 116; Jerwers Dep. 43. As the property was appraised, the owners received letters informing them that their property would be appraised, but the letters did not state why this was occurring. Patrick Dep., 20-21. Later in 2011, the owners received visits from representatives of Mannik & Smith presenting proposals to purchase property from the owners so that the road could be widened. *Id*. at 22-23; William Perry ("Perry") Dep., 16-17. For many of Appellants, this was the first notice they received that the road would be widened. Perry Dep. 14. Members of the public, including some of the Appellants, complained that the representative from Mannik & Smith was aggressive and told them that if they did not like the offer, the owner could fight over it in court, but they would lose. Patrick Dep., 23; Jerwers Dep., 43; Tr. Vol. I, 238-41; Tr. Vol. II, 100, 103. Essentially, the representative told them they could either take the offer or the county would take the property and pay that amount anyway. *Id*.

{¶5} On January 10, 2012, a public meeting was held in Pandora to discuss the Road 5 project. Tr. Vol. I, 58. At that meeting, Appellees, and

-4-

Recker, in his position as the County Engineer, were present to explain to the public what would be occurring. There was no intention to modify the plans as they were already complete. Tr. Vol. I, 59. There were several members of the public at the meeting who were unhappy with the project and expressed their displeasure to Appellees. Tr. Vol. I, 244. Many people at that meeting asked for notice of future meetings. Tr. Vol. II, 111.

{¶6} On February 10, 2012, Appellees met with Patrick, Andy Borgelt ("Borgelt") and Paul Burkholder ("Burkholder"). Tr. Vol. I, 107. Recker and his assistant were also present at that meeting. *Id.* at 108. Patrick left the meeting unhappy because he was told the project was "a done deal." *Id.* Patrick and Borgelt both asked for specific notice of any meetings concerning the appropriation of property. *Id.* at 108, 176; Betty Schroeder ("Betty") Dep. 82; Schroeder Dep., 93; Jerwers Dep., 62-63. The appropriation of the property along Road 5 was discussed at meetings on February 14, 2012, and February 21, 2012. Tr. Vol. I, 182-183. Appellees passed a resolution to appropriate the property at the February 24, 2012, meeting. Tr. Vol. 185. No notice was provided to Patrick about any of these meetings. Tr. Vol. 186. Other Appellants also were upset about the lack of notice concerning the project as a whole and before Appellees appropriated their property. Due to the activities of Appellees in failing to address the concerns of Appellants, Appellants sought a remedy from the courts.

*Procedural History*

{¶7} On March 12, 2012, Appellants, excluding Buckeye, filed a complaint for declaratory relief and a petition for a writ of mandamus against Appellees. Doc. 1. The complaint alleged that Appellants all owned property within the Board's Road 5 project. *Id*. at 3. Appellants alleged that although they had received notice that their property was to be taken by eminent domain, the public notices and deliberations were being done in secret and without the statutorily required notice. *Id*. Appellants took issue with the fact that the Board failed to include in its minutes the results of numerous meetings concerning the Road 5 project. *Id*. at 3-5, Ex. A-E (attached to Doc. 1.). Appellants also alleged in the complaint that the Board held a special meeting on February 24, 2012, without providing proper notice to the public and voted to appropriate the property of Appellants. *Id*. at 5. Based upon the Board's failure to keep full and accurate minutes and its failure to provide notice of the meetings, Appellants claimed to have suffered permanent damages and claimed the following violations: 1) the Board violated the Ohio Public Meetings Act set forth in R.C. 121.22 by failing to provide notice and 2) the Board violated the Ohio Public Meetings Act set forth in R.C. 121.22 by keeping incomplete minutes. *Id*. at 5-7. Appellants then requested the following relief: 1) Declaratory Judgment voiding any resolutions, rules, or formal actions adopted at the meetings violating R.C. 121.22; 2) Writ of

Mandamus requiring the Board to furnish complete, detailed, and accurate minutes for each of the meetings held; 3) Temporary Restraining Order enjoining the Board from appropriating the properties listed at the February 24, 2012, meeting; 4) Temporary Restraining Order enjoining the Board from improperly entering or ending an executive session if not specifically permitted by statute; 5) Temporary Restraining Order enjoining the Board from proceeding with the resolution of appropriations set forth at the February 24, 2012, meeting; 6) Temporary Restraining Order enjoining the Board from continuing the Road 5 Project until all actions are determined to be valid; 7) Civil forfeiture of "one hundred dollars ($500.00) (sic) per violation" of R.C. 121.22; 8) An order requiring the Board to pay Appellants' expenses incident to the action including reasonable attorney fees and costs; and 9) Any other relief deemed proper. *Id.* at 8-9.

{¶8} On April 2, 2012, Appellants filed a motion for a temporary restraining order and injunctive relief. Doc. 6. The motion requested that the Board be prohibited from acting on any resolutions passed at meetings in dispute for violations of R.C. 121.22. *Id.* On April 3, 2012, at 9:16 a.m., Appellees filed a response in opposition to Appellants' motion. Doc. 7. The response indicated that although the hearing on the complaint was scheduled for April 9, 2012, Appellees intended to hold a meeting on April 5, 2012, to "discuss the appropriation process", and requested the motion be overruled. *Id.* at 2. Appellants filed their

reply to Appellee's response on April 3, 2012, at 11:30 a.m. Doc. 8. The trial court overruled the motion at 12:11 p.m. on April 3, 2012, holding that Appellants had not demonstrated a probability of success on the merits. Doc. 9. Appellants then filed on April 4, 2012, a notice of appeal from that judgment. Doc. 10. The appeal was dismissed for lack of jurisdiction on April 23, 2012. *State ex rel. Patrick Bros, A Gen. Partnership, et al. v. Bd. of Putnam Cty. Commrs., et al.*, 3d Dist. Putnam No. 12-12-08.

{¶9} Appellees filed an answer to Appellants' complaint on April 6, 2012. Doc. 18. Also on April 6, 2012, Buckeye filed a motion to intervene as a third party plaintiff. Doc. 16. Buckeye also filed a motion to continue the April 9, 2012 hearing to allow time for preparation. Doc. 17. The trial court granted the motion to continue on April 9, 2012. Doc. 19. The trial court then scheduled a pre-trial for May 22, 2012. Doc. 22. On May 9, 2012, Appellants filed a certificate of service of the first set of interrogatories, requests for admissions, and requests for production of documents. Doc. 24. The May 22, 2012, pretrial was rescheduled for June 1, 2012, at the request of Buckeye. Doc. 28. On June 1, 2012, Appellees hand delivered the response to Appellants' discovery request. Doc. 29. In the response, Appellees made the following admissions. Doc. 30.

**REQUEST FOR ADMISSION NO. 1:**

**Admit there was no resolution passed by the Putnam County Commissioners approving the County Road 5 widening project.**

**ANSWER:**

**[Appellees] are unable to admit or deny there was no resolution passed by the Putnam County Commissioners approving the County Road 5 widening project despite making reasonable inquiry into the resolution records of the Putnam County Commissioner's office and that the information known or readily ascertainable to them is insufficient for them to admit or deny as of this date. To date, the inquiry suggests the Road 5 project dates back into the 1990's and a review of the resolutions dating back to that period is ongoing. However, the Putnam County Commissioner's (sic) have indicated through the inquiry their ongoing support of the road 5 project (sic) through letters of support, approval of purchase orders for services connected to the Road 5 project and the execution of services contracts in furtherance of the Road 5 project.**

**\* \* \***

**REQUEST FOR ADMISSION NO. 4:**

**Admit that the Putnam County Commissioners did not include the amount of compensation due the County Road 5 landowners, in the resolutions of appropriation dated April 5, 2012.**

**ANSWER:**

**[Appellees] admit that the Putnam County Commissioners did not include the amount of the compensation due the County Road 5 landowners in the Resolutions of Appropriation dated April 5, 2012.**

**REQUEST FOR ADMISSION NO. 5:**

**Please admit that Defendant County Commissioners have no written policy to inform the public of County Commissioner meetings.**

**ANSWER:**

**[Appellees] admit they have no written policy to inform the public of County Commissioner meetings.  The policy for how the Putnam County Commissioners' notice meetings, informing the public of the time, place and subject matter of their meetings has never been reduced to writing that any current employee or commissioner has ever seen or located while in office or employed by the Putnam County Board of Commissioners.  Rather, the policy for such notice of the Putnam County Commissioners meetings was established by the virtue of a course of conduct dating back at least twenty (20) years.  The Board of Putnam County Commissioners posted office hours are 8:30 am – 4:30 pm Monday through Friday and the Board of Commissioners are in session during those same hours every Tuesday and Thursday and until 11:30 am on every Friday.  The Clerk for the Putnam County Board of Commissioners or a Commissioner writes or posts public notice of the Board of Commissioner's meeting session for a given date on the approximate 3' x 5' dry erase board in the entry of the Commissioner's office and are also listed on the County Commissioners web site that went on line (sic) approximately in calendar year 2009.  The placement of these public postings on the meeting dry erase board are posted 24 hours or more in advanced (sic) of said session meetings.  The media is notified of said meetings by providing them a photo copy of the meeting board schedule if notice is requested or required.  The agenda for those session dates is posted to begin at 10 am.  All meetings not occurring on regularly scheduled meeting dates are considered special meetings and 24 hour notice is provided to the public and media outlets of the time, place and subject matter of such special meetings via posting on the public notice board in the Commissioner's office and by directly contacting the media outlets if notification has been requested by the media outlet.  In emergency meeting situations, the Board of Commissioner's office notifies the local media immediately of the time, place and purpose of the emergency meeting.**

*Id.* at 3-5. On June 12, 2012, the deposition of Recker was filed. Doc. 33. The deposition of Schroeder, along with exhibits, was filed on June 15, 2012. Doc. 34.

{¶10} On June 15, 2012, an amended complaint for declaratory relief and a petition for a writ of mandamus, which included Buckeye as a third-party plaintiff, were filed. Doc. 35. The amended complaint set forth multiple counts for recovery. The first was that Appellees had violated the Ohio Public Meetings Act as set forth in R.C. 121.22 by failing to give reasonable notice of meetings and failing to give specific notice when requested. *Id.* at 10-12. The second was that Appellees violated the Ohio Public Meetings Act as set forth in R.C. 121.22 by failing to keep proper minutes. *Id.* at 12-15. Next, Appellants claimed that Appellees violated R.C. 5555.06 by failing to enact an enabling resolution by unanimous vote prior to taking steps to appropriate the property along Road 5. *Id.* at 15-16. The fourth count alleges that Appellees denied Appellants the opportunity to participate in the decision making process. *Id.* at 17-19. In the fifth count, Appellants allege that Appellees failed to follow R.C. 5555.07 by failing to publish a notice of hearing on objections of the plans after receiving the final plans from the county engineer. *Id.* at 19-20. The sixth count claimed that Appellees violated R.C. 307.08 requiring that the Board fix the amount of compensation in their resolution of appropriation. *Id.* at 20-21. In the seventh count, Appellants claimed that Schroeder and Love were individually liable for recklessly continuing

the Road 5 project without an enabling resolution. *Id.* at 21-23. Appellants then requested relief in the form of declaratory judgment, a writ of mandamus, temporary restraining orders, civil forfeiture of five hundred ($500.00) per violation, and an order invalidating all Road 5 project appropriation proceedings. *Id.* at 23-25. Appellants also requested that Appellees pay expenses for the action, including attorney fees and costs. *Id.* at 25. Appellees filed their answer on July 6, 2012, denying all allegations of wrongdoing and raising several affirmative defenses. Doc. 41.

{¶11} On July 6, 2012, Appellants filed a joint motion for partial summary judgment. Doc. 42. The motion alleged that the Board had failed to pass a resolution to widen the road and thus were not authorized by law to appropriate property. *Id.* at 2. Appellants claimed that the undisputed facts showed that Appellees did not enact an enabling resolution determining that the project was necessary for the public convenience and welfare by a unanimous vote as required by R.C. 5555.06. *Id.* at 7-10. Additionally, Appellees failed to file the plans and surveys in the office once finalized as required by R.C. 5555.07. *Id.* at 9-10. Appellants also claimed that Appellees illegally proceeded with the project even though the statutory requirements were not met. *Id.* at 11. In support of its motion, Appellants filed the affidavits of Matthew Cunningham ("Cunningham") and Lana M. Foppe ("Foppe"). Cunningham stated that he searched the resolution

journals at the Putnam County Commissioners' Office for a resolution in compliance with R.C. 5555.06 and for a notice that the plans and surveys were filed. Doc. 42 at Cunningham Affidavit 1-2. Cunningham and Foppe indicated in their respective affidavits that they searched from May 14, 1999 to April 9, 2012, but no resolutions or notices were found. *Id*. at 2 and Doc. 42 at Foppe Affidavit 2. The trial court then ordered that all motions for summary judgment must be filed by July 16, 2012, any responses to the motion must be filed by July 30, 2012, and replies to the responses must be filed by August 6, 2012. Doc. 44. On July 23, 2012, Appellees filed a motion to extend the discovery deadline from July 25, 2012, until August 29, 2012. Doc. 47. Appellees filed a response to the July 6, 2012, motion for summary judgment on July 30, 2012. Doc. 50. In the response, Appellees argued that even though they may not have passed a resolution under R.C. Chapter 5555, they had done so under R.C. Chapter 5553 and that R.C. Chapter 163, not Chapter 5555 is the appropriate chapter for the review. *Id*. at 2. Appellants filed their reply to Appellees' response on August 6, 2012. Doc. 53. The trial court overruled Appellants' motion for summary judgment on August 14, 2012. Doc. 55.

{¶12} On August 13, 2012, the day before the trial court ruled on Appellants' motion for summary judgment, Appellees filed a motion for partial judgment on the pleadings, which requested that claims three through seven of the

amended complaint be dismissed for failing to state a claim upon which relief could be granted. Doc. 54. Appellants filed their reply to this motion on August 27, 2012. Doc. 60. On August 31, 2012, Appellants filed a motion to supplement their reply. Doc. 62. Appellees filed their reply to Appellants' response on September 17, 2012. Doc. 67. On September 24, 2012, the trial court sua sponte turned the motion for judgment on the pleadings into a motion for summary judgment as to claim seven. Doc. 70. On September 28, 2012, in response to the trial court's ruling, Appellees filed a motion for partial summary judgment against Appellants as to claim seven of the amended complaint. Doc. 72. Appellants then filed a motion for additional time to file a response in order to conduct additional discovery. Doc.76. This motion was granted by the trial court on October 15, 2012. Doc. 78. Appellants filed their response on October 29, 2012. Doc. 102. Appellees then filed their response on November 6, 2012. Doc. 103.

{¶13} In the meantime, the trial court held a hearing on Appellants' request for a preliminary injunction on October 22 and 23, 2012. Doc. 106. The trial court then set forth several pages of findings of fact. *Id*. at 1-10. The trial court denied Appellants' request for a preliminary injunction. *Id*. at 19.

{¶14} On January 10, 2013, the trial court entered partial summary judgment as to Appellants' seventh claim in the amended complaint. Doc. 108. The trial court made several findings of fact in this judgment entry. The trial court

determined that Appellees appropriated certain portions of Appellants' properties at the April 5th, 2012 meeting. *Id*. at 3. The trial court also determined that on July 12, 2012, Appellees passed a resolution declaring that the widening of the road was necessary for public convenience and welfare. *Id*. at 4. A further determination was that a final hearing on the proposed widening was held on July 27, 2012. *Id*. Additionally, the trial court determined that after the hearing, Appellees passed a resolution determining that the widening of Road 5 would serve the public convenience and welfare. *Id*. Finally, the trial court determined that the individual commissioners were not personally liable for anything as they had statutory immunity and granted the motion for partial summary judgment. *Id*.

{¶15} On February 4, 2013, the trial court entered judgment denying the permanent injunction requested by the amended complaint. Doc. 111. Based upon its prior decisions, the trial court determined that there was no need to conduct any more hearings. *Id*. The trial court then found in favor of Appellees on all counts. *Id.* Appellants filed their notice of appeal on March 1, 2013. Doc. 114. Appellants raise the following assignments of error on appeal.

**First Assignment of Error**

**The trial court erred in ignoring uncontroverted evidence of violations of Ohio Sunshine Act in drawing its findings of fact.**

**Second Assignment of Error**

**The trial court erred by failing to find irreparable harm and prejudice to Appellants when irreparable harm and prejudice are irrebuttably presumed by the Ohio Sunshine Act.**

**Third Assignment of Error**

**The trial court erred in failing to invalidate resolutions adopted after violating the Ohio Sunshine Act.**

**Fourth Assignment of Error**

**The trial court erred in determining that the easement records were lost or destroyed when there was no evidence that any records ever existed.**

**Fifth Assignment of Error**

**The trial court erred in concluding the commissioners validly authorized the widening of County Road 5.**

**Sixth Assignment of Error**

**The trial court erred by affirming the county commissioners' retroactive legislation granting the authority to take private property in eminent domain proceedings.**

{¶16} In this case, Appellants requested a preliminary injunction along with declaratory judgment. "An injunction is an extraordinary remedy in equity where there is no adequate remedy available at law." *Garano v. State*, 37 Ohio St.3d 171, 172, 524 N.E.2d 496 (1988) (superseded by statute on other grounds). A court should only grant an injunction to prevent a future wrong. *Id.* "The grant or denial of an injunction is solely within the trial court's discretion and, therefore, a

reviewing court should not disturb the judgment of the trial court absent a showing of a clear abuse of discretion." *Id.* An abuse of discretion occurs when the trial court's judgment is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

{¶17} Contrary to the standard of review for the granting of an injunction, the standard for declaratory judgment is less clear. The Ohio Supreme Court has held that an appellate court should review the question of whether it is appropriate to dismiss a declaratory judgment action using an abuse of discretion standard. *Arnott v. Arnott*, 132 Ohio St.3d 401, 2012-Ohio-3208, ¶13, 972 N.E.2d 586. However, the questions of law are to be reviewed using a de novo standard of review. *Id.*

{¶18} The first two assignments of error each allege that Appellees violated the Ohio Sunshine Act. One of the bases of this complaint was that Appellees were failing to provide notice as required by statute. There is no dispute that at the time the complaint was filed, Appellants had no written policy and relied solely upon past practice.[2] Tr. Vol. I, 225; Vol. II, 190; Jerwers Dep., 117-18; Schroeder Dep., 19, 51; Love Dep., 18. Thus, it may be helpful to understand what the general practices of the Putnam County Commissioners Office were in regards to meetings. The Commissioners Office has meetings from 8:30 a.m. until 4:30 p.m.

---

[2] A resolution setting forth a written policy was passed on August 30, 2012.

when they close, as all meetings are considered public meetings unless they occur in executive session. Betty Dep., 29, 64-67; Schroeder Dep., 26-27; Jerwers Dep., 17. However, on Tuesdays, Thursdays, and possibly Fridays, if necessary, there are meetings, titled "agenda meetings" at which resolutions are passed. Tr. Vol. I, 137; Betty Dep., 16-17; Schroeder Dep., 17; Jerwers Dep., 15-16, 18-19. These meetings are held at 10:00 a.m. on those days and the topic for the agenda is not disclosed in advance. Betty Dep., 17, 26-28, 53; Schroeder Dep., 23, 30. The official notice for all of the meetings occurred when the meeting was written on a large, white, dry-erase board positioned at the rear of the office. Betty Dep., 26; Schroeder Dep., 17; Love Dep., 24. There was also a website calendar, but it was not always accurate, so was not the official notice. Betty Dep., 26, 31, 123; Schroeder Dep., 34, 111, 120; Jerwers Dep., 102. The white board was the only way to know everything that was scheduled. Tr. Vo. I, 144; Betty Dep., 124, Schroeder Dep, 111; Jerwers Dep., 12; Love Dep., 24. Any of the commissioners or any other public official could add to the white board at any time. Schroeder Dep., 20. The only requirement was that notices had to be put on the board for at least 24 hours before the meeting. Schroeder Dep., 53.

{¶19} As for the agenda meetings, the topics to be covered at the meeting were not listed. Betty Dep., 17, 26-28, 53; Schroeder Dep., 23, 30. The board merely stated "agenda" and the time. *Id*. If a person or entity requested specific

notice of meetings, the Commissioner's Clerk, who was Betty at that time, would try to remember to call or email them. Betty Dep., 53-54; Schroeder Dep., 20-21. There was no formal method for requesting specific notice or that would provide assurance that the notice would be given. This was the system that had been used for many years and continued to be the unwritten policy of Appellants. Jerwers Dep., 117-18; Schroeder Dep., 19, 51; Love Dep., 18.

{¶20} Ohio's open meetings requirements are set forth in R.C. 121.22, which states in pertinent part as follows.

> **(A)  This section shall be liberally construed to require public officials to take official action and to conduct all deliberations upon official business only in open meetings unless the subject matter is specifically excepted by law.**
>
> **(B)  As used in this section:**
>
> **(1)   "Public body" means any of the following:**
>
> **(a)  Any board, commission, committee, council, or similar decision-making body of a state agency, institution, or authority and any legislative authority or board, commission, committee, council, agency, authority, or similar decision-making body of any county, township, municipal corporation, school district, or other political subdivision or local public institution;**
>
> **\* \* \***
>
> **(2)   "Meeting" means any prearranged discussion of the public business of the public body by a majority of its members.**
>
> **\* \* \***
>
> **(C)  All meetings of any public body are declared to be public**

**meetings open to the public at all times. A member of a public body shall be present in person at a meeting open to the public to be considered present or to vote at the meeting and for purposes of determining whether a quorum is present at the meeting.**

**The minutes of a regular or special meeting of any public body shall be promptly prepared, filed, and maintained and shall be open to public inspection. The minutes need only reflect the general subject matter of discussions in executive sessions authorized under division (G) or (J) of this section.**

**\* \* \***

**(F) Every public body, by rule, shall establish a reasonable method whereby any person may determine the time and place of all regularly scheduled meetings and the time, place, and purpose of all special meetings. A public body shall not hold a special meeting unless it gives at least twenty-four hours' advance notice to the news media that have requested notification, except in the event of an emergency requiring immediate official action. In the event of an emergency, the member or members calling the meeting shall notify the news media that have requested notification immediately of the time, place, and purpose of the meeting.**

**The rule shall provide that any person, upon request and payment of a reasonable fee, may obtain reasonable advance notification of all meetings at which any specific type of public business is to be discussed. Provisions for advance notification may include, but are not limited to, mailing the agenda of meetings to all subscribers on a mailing list or mailing notices in self-addressed, stamped envelopes provided by the person.**

**(G) Except as provided in division (J) of this section, the members of a public body may hold an executive session only after a majority of a quorum of the public body determines, by a roll call vote, to hold an executive session and only at a regular or special meeting for the sole purpose of the consideration of any of the following matters:**

-20-

* * *

**(2)   To consider the purchase of property for public purposes, or for the sale of property at competitive bidding, if premature disclosure of information would give an unfair competitive or bargaining advantage to a person whose personal, private interest is adverse to the general public interest.  No member of a public body shall use division (G)(2) of this section as a subterfuge for providing covert information to prospective buyers or sellers.  A purchase or sale of public property is void if the seller or buyer of the public property has received covert information from a member of a public body that has not been disclosed to the general public in sufficient time for other prospective buyers and sellers to prepare and submit offers.**

* * *

**(H)  A resolution, rule, or formal action of any kind is invalid unless adopted in an open meeting of the public body.   A resolution, rule or formal action adopted in an open meeting that results from deliberations in a meeting not open to the public is invalid unless the deliberations were for a purpose specifically authorized in division (G) or (J) of this section and conducted at an executive session held in compliance with this section.  A resolution, rule or formal action adopted in an open meeting is invalid if the public body that adopted the resolution, rule or formal action violated division (F) of this section.**

**(I)(1) Any person may bring an action to enforce this section. An action under division (I)(1) of this section shall be brought within two years after the date of the alleged violation or threatened violation.  Upon proof of a violation or threatened violation of this section in an action brought by any person, the court of common pleas shall issue an injunction to compel the members of the public body to comply with its provisions.**

**(2)(a) If the court of common pleas issues an injunction pursuant to division (I)(1) of this section, the court shall order the public body that it enjoins to pay a civil forfeiture of five hundred**

**dollars to the party that sought the injunction and shall award to that party all court costs and, subject to reduction as described in division (I)(2) of this section, reasonable attorney fees. The court, in its discretion, may reduce an award of attorney's fees to the party that sought the injunction or not award attorney's fees to that party if the court determines both of the following:**

**(i) That, based on the ordinary application of statutory law and case law as it existed at the time of violation or threatened violation that was the basis of the injunction, a well-informed public body reasonably would believe that the public body was not violating or threatening to violate this section;**

**(ii) That a well-informed public body reasonably would believe that the conduct or threatened conduct that was the basis of the injunction would serve the public policy that underlies the authority that is asserted as permitting that conduct or threatened conduct.**

**\* \* \***

**(3) Irreparable harm and prejudice to the party that sought the injunction shall be conclusively and irrebuttably presumed upon proof of a violation or threatened violation of this section.**

R.C. 121.22 eff. 9-29-11.

{¶21} The first cause of action stated in the amended complaint was that Appellees violated R.C. 121.22 by failing to give reasonable notice and by failing to give requested specific notice. As discussed above, there was no official policy for requesting specific notice and no method of insuring that the notice was sent. The only notice was the writing on the white board in the Commissioners' Office and the incomplete internet calendar. However, some of the meetings that are scheduled and listed on the white board were not listed on the internet version of

the calendar. Tr. Vol. II, 73; Betty Dep., 123; Schroeder Dep., 111. The white board was the only way to know what was scheduled. Tr. Vol. I, 144; Betty Dep., 124; Schroeder Dep., 111; Jerwers Dep., Love Dep., 24. This then leads to the issue of whether the white board is in and of itself sufficient notice to satisfy the statutory requirements.

{¶22} The white board was located on the right wall approximately twenty feet past the entrance. Schroeder Dep., 21-22, Tr. Vol. I, 141. Exhibit WWW shows several images of the dry erase board and its placement. Although the board itself was visible from the entrance and the front counter, it could not be read from there. Tr. Vol. I, 142-43; Exhibit WWW. When viewed from the far side of the counter, the board was visible and could be partially read, however the view of the bottom of the board was obstructed by office furniture. *Id*. The only apparent way to clearly view the board would be for a member of the general public to walk past the counter to the rear of the office.[3] Jerwers admitted that the board was placed in a position that could not easily be read by the general public. Tr., Vol. I., 143; Jerwers Dep., 115. Perry, the officer who testified on behalf of Buckeye, testified that he went into the commissioners' office after the meeting on July 12, 2012. Tr. Vol. II, 18. Perry observed the white board in the back corner of the office, but was unable to read it from any of the public areas of the office.

---

[3] Since the changes on August 30, 2012, Appellees are now posting a copy of the dry erase board on the door to their office.

*Id.* at 18-19. Marlena Ballinger ("Ballinger"), the editor of the Putnam County Sentinel, testified that Ex. WWW was an accurate reflection of where the white board was located in the office. *Id.* at 44-47. Ballinger testified that she could not read the white board from the reception counter and that she needed to go past the reception counter into the office to read it. *Id.* at 48. To stay current on what was scheduled for each day, people needed to check the white board in the office daily or call and inquire. Schroeder Dep., 21, 30, 52, 112.

{¶23} As for knowing what topics would be addressed at the agenda meetings, Betty stated in her deposition that the public can know what is occurring at the meetings by coming "in at 10:00 o'clock, they can sit there the whole day long." Betty Dep., 64. Schroder testified in his deposition that if the public wants to know the location or purpose of a meeting, they needed to inquire and that the commissioners were not required to notify the public of the location of a meeting.[4] Schroeder Dep. 46-48. The only way for the public to know what was on the agenda for resolution is for them to come to the meetings as that information was not available in advance. *Id.* at 56-60. In order for the public to be continually updated as to when meetings will be held, they needed to come into the office daily. *Id.* at 111-12. Different meetings were added throughout the day, so

---

[4] This testimony is in direct conflict with the statute which requires the public body to establish a reasonable method from which any person can determine the time and place of all regularly scheduled meetings.

checking it at one point in the day may not tell one about a meeting to be held the next day if it was added after one last checked the board. *Id.* at 114-131.

**{¶24}** R.C. 121.22(F) requires all public bodies to establish a rule which sets forth a reasonable method for the general public to determine the time and place of all regularly scheduled meetings as well as the time, place, and purpose of all special meetings. The rule also must contain a procedure by which interested parties can obtain advance notification. The failure to have such a rule is a violation of R.C. 121.22(F). *Doran v. Northmont Bd. of Edn.*, 147 Ohio App.3d 268, 2002-Ohio-386, 770 N.E.2d 92, ¶12. The statute requires that the public body have a rule that provides for notice that is consistent and actually reaches the public. *Id.* Although the violation of the statute may be remedied, the remedy does not negate the prior violation and the statute mandates that an injunction be issued if a violation was found to have existed. *Id.* at ¶13. *See Doran v. Northmont Bd. of Edn. II*, 2d Dist. Montgomery No. 19956, 2003-Ohio-7097, ¶5. A trial court is bound by the remedy provisions of R.C. 121.22(I) even for a "technical violation" of the statute and even if the violation was subsequently cured. *Vermilion Teachers' Assn. v. Vermilion Local School Dist. Bd. of Edn.*, 98 Ohio App.3d 524, 648 N.E.2d 1384 (6th Dist. 1994).

**{¶25}** In this case, the evidence is undisputed that Appellees did not have a rule that established a procedure for reasonable notice to the public. The only

consistent public notice was a white board placed at the rear of the office, which was not readable from the public area of the office. The internet calendar, at best, could be considered incomplete and, at worst, misleading as it contained notice of some meetings, but not all. The information on the white board was not always complete either in that it did not always state where the meeting would be occurring if not in the usual location. Schroeder testified that he, as a commissioner, did not believe the office was required to give that information unless specifically asked. Schroeder Dep., 46-48. Some meetings which were held in different locations were not noted as such on the white board. This view was held and followed despite the fact that the statute requires notice of time and place of all regularly scheduled meetings be given. In addition, there was no policy in place for the public to be able to obtain advance notice as is required by R.C. 121.22(F). Instead, Appellees relied upon habit and the good intentions of the Clerk to call the press and others if she remembered. This system cannot be deemed reasonable as it provides no notice if the clerk forgets or, as occurred on one instance, was out sick. The failure to have the required rules and procedures is a violation of R.C. 121.22(F). Thus, the trial court was mandated by the statute to order an injunction to compel Appellees to comply with the statutory provisions. R.C. 121.22(I)(1).

{¶26} The first allegation of the amended complaint also claims that Appellees violated R.C. 121.22(F) by not providing specific notice of meetings when requested. The undisputed evidence, as discussed above, reveals that Appellees did not have a policy for specific notice. Betty Dep., 74-76; Schroeder Dep., 19. The result of this is that there was no correct procedure for requesting specific notice and no fee to be paid. Prior to the written policy being instituted on August 30, 2012, Betty would just call those who asked, if she remembered, because she wanted to be helpful. *Id*. As discussed above, the failure to have a policy for specific notification is a violation. Schroeder testified at his deposition that he did not remember any official requests for notice. Schroeder Dep., 184., Tr. Vol. II, 165. The only official request he recalled was made verbally by the media the week before his deposition. Schroeder Dep., 184. However, Schroeder testified differently at the hearing when he testified that someone asked him for notice while he was speaking to the person on the phone, though he could not remember who. Tr. Vol. II, 166. Schroeder did not think that was really a request for notice, but was rather a favor. *Id*. Schroeder testified that he did not give this person notice. *Id*. at 167. During his deposition, Schroeder testified that at a meeting in February 2012, someone asked for notice, but he could not recall specifically who asked. Schroeder Dep., 93. Schroeder testified that he did not think that person meant he wanted notice of when they would be voting on

-27-

resolutions of appropriations. *Id.* He remembered telling the person that he would let them know, however he did not provide the requested notice. *Id.*

**{¶27}** Jerwers testified that at a February 2012 meeting, Patrick and Borgelt specifically requested notice of any meetings regarding their respective property parcels. Tr. Vol. I, 176; Jerwers Dep., 62-63. No notice was given to Patrick prior to the meeting on February 24, 2012, when Appellees passed a resolution appropriating Patrick's property. *Id.* at 177. This was confirmed by Betty who testified that she only provided notice of the meeting on February 24, 2012, to Borgelt. Betty Dep., 82-83. Love testified during his deposition that the person who would give notice would be the clerk, so if Betty said there was no notice sent, there was no notice. Love Dep., 19-20. Patrick testified that he attended a meeting on February 10, 2012 with Appellees, Borgelt, Burkholder, Recker, and Troy Recker, who was Recker's assistant. Tr. Vol. I, 107-108. At the conclusion of the meeting, Patrick asked Appellees to notify him of any meetings concerning the appropriation of his property. *Id.* at 108., Patrick Dep., 27. His property was appropriated at the meeting on February 24, 2012, but he received no notice of the meeting and did not attend it. Tr. Vol. I, 109.

**{¶28}** Perry testified that he received no notice of any meetings, including the notices sent out to other property owners concerning the meeting on April 5, 2012. Tr. Vol. II, 12-14. Not knowing of meetings, he did not attend them. *Id.* at

14. He noted that when the commissioners were having meetings concerning ditches, they sent out letters to the property owners concerning the upcoming project and assessments. *Id*. at 36. "[T]hey send us a letter for ditch hearings, but they don't send us a letter when they appropriate your property. It seems awful funny." *Id*. at 37.

{¶29} Ballinger testified that if there were going to be Friday meetings, Betty would email her because the Friday meetings do not always occur. *Id*. at 43. When Ballinger went to the commissioners' office on February 23, 2012, for the 10:00 a.m. agenda meetings, she did not see notice of a meeting for Friday and she did not receive notice from Betty. *Id*. at 49-53. Soon afterwards, she verbally requested to be notified specifically of any changed agenda meetings or Friday meetings. *Id*. at 58. However, she only got notice of the 4:00 p.m. meeting held on July 12, 2012, (where resolutions were passed to appropriate the property by statute), thirty minutes prior to the meeting. *Id*. at 61. This occurred despite the fact that she had the internet calendar of the Board streamed to her phone so that she learned of all updates immediately. *Id*. at 72. The internet calendar never indicated that a meeting would be occurring at 4:00 p.m. that day. *Id*. at 73. The next day, she submitted a written request for notice since the verbal requests were not being observed. *Id*. at 80, 86.

{¶30} Lisa Stainbrook ("Stainbrook") testified that she called the Appellees in June of 2012 for notice of all meetings regarding the Road 5 project. Tr. Vol. II, 93-94. A month later Stainbrook sent an email to Appellees again requesting specific notice of meetings about the Road 5 project. *Id*. at 94. As of the date of the hearing, she had received no notices from the Board. *Id*. at 95.

{¶31} Finally, Horstman testified that she sent a letter to Recker and one to the Appellees requesting notification of any and all activities regarding the Road 5 project. Tr. Vol. II, 105-106, Ex. TTTT. She personally sent the letter by U.S. mail and presumed it was received. Tr. Vol. II, 130. She was unsure of which meeting she actually received notice, but there was only one meeting that notice was sent. Tr. Vol. II, 107, 120, 133. Horstman testified that she was able to attend several of the meetings because she heard about them from other people. *Id*. at 133.

{¶32} All of the above evidence was presented to the trial court and was not disputed. At times, Appellees testified that they did not recall what was said or who said it. However, they did not deny that the requests were made.[5] They also did not deny that the requested notices were not provided. These undisputed facts show that there were violations of R.C. 121.22(F). Appellees violated the statute

---

[5] Schroeder attempted to deny that "official" requests were made, but rather felt that the requests were made on a personal level, not to him as a commissioner. Tr. Vol. II, 166. "But that was to a commissioner, it was a relationship, not to do with the Commissioners (sic) Office. It was a constituent/commissioner type of conversation. I do a lot of that." *Id*. However, this belief does not account for the fact that when acting as a commissioner, Schroeder is an agent of the Board and requests made to him are attributable to the office. Schroeder admitted that he did not keep the party who requested notice informed.

as a matter of law by failing to establish a rule for reasonable notice to the public and for failing to have a rule in place for providing specific notice of meetings when requested as mandated by R.C. 121.22(F).[6]

{¶33} In addition to the failure to provide notice of the meetings, Appellants claim that Appellees erred by failing to keep full and accurate minutes. The standard procedure for the Board when it came to keeping the minutes was explained by Betty. In her deposition, Betty testified that there were no set procedures for keeping minutes or dealing with public records requests until after the August 30, 2012, meeting. Betty Dep., 121. Instead, Betty just kept the records the way she had been shown by her predecessor. Betty testified that she keeps four books of records: 1) a book of resolutions, 2) a book of minutes of the meetings, 3) a book containing the discussions had at the meetings, and 4) an appointment book showing what meetings were held and when. Betty Dep. 12-14. The only items in the resolution book are the resolutions that were approved. *Id.* at 16. The unapproved resolutions were kept in the minutes book and marked unapproved. *Id*. at 15. The minutes are taken from the agenda and provide a basic overview of what happens at the meetings. *Id*. at 16-17. The Board approves the minutes from the last meeting at the beginning of the next meeting. The book of

---

[6] The trial court did not consider the failure of Appellees to provide specific notice of the meeting before April 5 because it considered that meeting as the one where the official appropriations took place and found that the parties received notice of that meeting because they were present. However a subsequent meeting does not cure the failure to provide the specific notice required for the February 24, 2012 meeting.

discussion notes is a complete summary of the discussions occurring at the meetings taken as they are occurring. *Id*. at 20. The discussion notes are not part of the minutes and are not reviewed or approved by the Board. *Id*. at 18-22. If a person was to come and ask for the minutes, they would not be given the discussion book or told that it exists. *Id*. at 22. The appointment book was a copy of the daily printout from the white board showing the meetings and their times. To see all of these records, a person would need to specifically request all of them.

{¶34} R.C. 121.22(C) requires all public bodies keep "a full written record" of all general and special meetings, that they be promptly prepared and filed, and that they be available for inspection by the public. All proceedings of a board of county commissioners are public and shall occur at the office of the board unless authorized by R.C. 305.06 or R.C. 305.07. R.C. 305.09. All regular sessions and special sessions will be held at the county commissioners' office unless the commissioners pass a resolution to hold one in a different location, enter the new location on the journal of the board, and provide reasonable public notice of the change of location. R.C. 305.06 and R.C. 305.07.

> **(C) Except as otherwise provided in division (B) of this section, the clerk of the board of county commissioners shall keep a full written record of the proceedings of the board, and a written general index of those proceedings, entering each motion with the name of the person making it on the record. The clerk shall call and record the yeas and nays on each motion. The clerk shall state fully and clearly in the record any question relating to the powers and duties of the board which is raised for its**

> **consideration by any person having an interest therein, together with the decision on such question, and shall call and record the yeas and nays by which the decision is made. When requested by a party interested in the proceedings or by a party's counsel, the clerk shall record any legal proposition decided by the board, the decision thereon, and the votes by which the decision is reached. If either party, in person or by counsel, takes exception to such decision, the clerk shall record the exceptions with the record of the decision.**

R.C. 305.10. The Ohio Supreme Court has interpreted this statute as imposing upon public bodies, such as county commissioners, "a clear legal duty to record descriptions of pre-arranged discussions in its minutes." *White v. Clinton Cty. Bd. Of Commrs.*, 76 Ohio St.3d 416, 1996-Ohio-380, 667-N.E.2d 1223 (citing *State ex rel. The Fairfield Leader v. Ricketts*, 56 Ohio St.3d 97, 564 N.E.2d 486 (1990)). The Ohio Supreme Court then went on to discuss what makes up a "full record" of the proceedings.

> **R.C. 305.10 does not contain a definition of "full record" or "proceedings." As a result, we give these words their plain and ordinary meaning. * * * Webster's Third New International Dictionary (1986) 918, 919, defines "full" as "containing all that can possibly be placed or put within"; "containing all details: complete." Accordingly, a "full record" would be one in which the details of the recorded event are contained. "Proceedings" is defined as "an official record or account (as in a book of minutes) of things said or done (as at a meeting or convention of a society)." * * ***
>
> **\* \* \***
>
> **As already noted, R.C. 121.22 requires the preparation, filing, and maintenance of a public body's minutes. Granted, the statute does not explicitly state what should be included in the**

**minutes of a county board of commissioners' meeting. However, we can glean more about the requirements of R.C. 121.22(C) by examining the last sentence of that subsection, which states that the minutes of a public body's executive sessions "need only reflect the general subject matter of discussions * * *." When one considers the sensitive nature of the topics examined in executive sessions, it follows from this language that it is *only* the minutes of an executive session which may be properly limited to "the general subject matter of discussions." The minutes of *any other meeting* of a public body must contain a more substantial treatment of the items discussed, and certainly should not be limited to a mere recounting of the body's roll call votes.**

**\* \* \***

**\* \* \* [W]e refrain from laying down specific guidelines, other than the dictate that for public records maintained under R.C. 121.22 and 305.10, full and accurate minutes must contain sufficient facts and information to permit the public to understand and appreciate the rationale behind the relevant public body's decision. \* \* \***

*Id*. at 422-424.[7] In addition, the Ohio Supreme Court has held that minutes are those that are approved as the minutes, not information from additional sources. *See State ex rel. Long v. Cardington Village Council*, 92 Ohio St.3d 54, 2001-Ohio-130, 748 N.E.2d 58.

{¶35} Appellees and Betty testified that all of their meetings during the business day are public meetings. Betty Dep., 29, 66-67; Schroeder Dep., 26-27, 60-61; Jerwers Dep., 17; Love Dep., 14-15; and Tr. Vol. I, 138. Since all of the meetings are public meetings, there should be minutes for every meeting. In the

---

[7] Although the statute version has changed since this case was released, the language of the statute on this issue has not changed.

court below, Appellants specifically challenged the minutes of the meetings for February 9 and 10, 2012. A review of the minutes shows that the minutes for these two days were combined. The document contained paragraphs designated as the "minutes" for February 9, 2012 and brief paragraphs called "discussion notes from February 10, 2012". Appellants claim these minutes did not comply with the statute because they did not include the four pages of "Discussion Notes" which were not part of the approved minutes and were kept in a different volume. Appellants also claim this same scenario occurred on February 16 and 17, 2012. Finally, Appellants claim that the minutes for the July 12, 2012 meeting were inaccurate because they did not contain any of the objections made at the meeting. The discussion notes did contain the objections. We will review each of these challenged versions of the minutes separately.

{¶36} A review of the minutes for February 9 and 10, 2012, contained one discussion note as the minutes for the February 10, 2012 meeting and read as follows.

**9:00 a.m. – 11:00 a.m.**

**Commissioners Love, Schroeder and Jerwers and administrator Jach Betscher, Andy Borgelt, Paul Burkholder, Tom Patrick, Terry Recker, Troy Recker concerning the widening of Road 5. Gentleman from Putnam County Sentinel walked in late.**

Ex. A. This was the official version of the minutes for that meeting. Yet, Exhibit XXX provided four pages of discussion notes on the meeting, which were not

approved by the commissioners or anyone else. Betty testified that although she keeps discussion notes, they are not considered part of the minutes and she does not give them to anyone who only requests a copy of the minutes. Betty Dep. 20-22. She also testified that although the discussion notes are part of the public record, they are only provided upon a specific request for the discussion notes. *Id.* at 121. Schroeder admitted during his deposition that the minutes do not always indicate what a discussion was about, only that a meeting occurred. Schroeder Dep., 99. He also testified that discussions happen that are not included in the minutes. *Id.* at 145. Ballinger testified that in the two years she had been covering the Commissioners' Office, she was unaware that they had discussion notes until recently. Tr. Vol. II, 64. The minutes for the February 10, 2012, meeting, which were designated as "discussion notes" when combined with the minutes for February 9, 2012, do not comply with the Ohio Supreme Court's requirements set forth in *White* and *State ex rel. Long*. A full discussion of what occurred at the meeting was set forth in four pages of discussion notes. A single paragraph indicating that a meeting occurred is insufficient to let the public understand and appreciate what happened at that meeting. Although the information was set forth in the "discussion notes" for that date, those notes are not part of the minutes. The Ohio Supreme Court has held that the minutes do not include other documents that are not approved, which is the situation with the discussion notes. *State ex rel.*

*Long*, *supra*. Thus, the minutes for February 10, 2012 do not comply with R.C. 121.22(C).

{¶36} Jerwers testified that although the commissioners had a meeting at the prosecutor's office on February 17, 2012, neither Betty nor an assistant clerk attended and no one took minutes at the meeting. Jerwers Dep. 75-76. A review of Exhibit C, which is the minutes for February 16 along with discussion notes for February 17, 2012,[8] indicates only that a meeting took place between the commissioners, the Clerk of Courts, and the County Administrator regarding the yearly review of the court system. The meeting with the prosecutor is not indicated as having occurred. At trial though, Jerwers testified, inconsistent with his deposition testimony, that the meeting occurred on February 21, 2012, with all three commissioners, representatives from ODOT, and the prosecutor to discuss the Road 5 project. Tr. Vol. I, 183-84. Although Jerwers testified that it was a different date, he again testified that although it was a public meeting, neither Betty nor an assistant clerk was present. *Id.* at 184. The minutes for February 21, 2012, indicate that there was a meeting, but provides no additional information. "9:00 a.m. Commissioners Love, Schroeder and Jerwers met at the prosecutor's office with Ohio Department of Transportation officials regarding Road 5." Ex. D. This was a public meeting, not an executive session. Thus, Appellees were

---

[8] The exhibit states that it is the minutes for Thursday, February 16, 2012, and discussion notes for Friday, February 17, 2011. We presume that the 2011 was a typographical error as the discussion notes followed the minutes for Thursday.

-37-

required by R.C. 121.22(C) to keep full minutes, not just reference the subject matter. *White, supra*. That did not occur in this case as no minutes were taken at the actual meeting. The failure to keep a full and accurate record of the public meetings of the Board is a violation of R.C. 121.22(C).

{¶37} Similarly, there was a meeting held on July 12, 2012. Betty Dep., 115-16. At that meeting, an attorney raised objections. *Id.* A review of the minutes does not indicate that any objections were made by anyone. *Id.* However, a review of the discussion notes does show that the objections were made. *Id.* at 116-17. This is a problem because a review of the approved minutes, without reference to another source, would not give the public an accurate representation of what occurred at the meeting. Again, Appellees were relying upon unapproved documents to provide complete minutes of the meeting. This does not comply with the statutory requirements of R.C. 121.22(C).

{¶38} The final alleged violation by Appellants is that Appellees entered into executive session for inappropriate purposes. The purposes for which a public body may enter into an executive session are limited.

> **(G) Except as provided in division (J) of this section, the members of a public body may hold an executive session only after a majority of a quorum of the public body determines, by a roll call vote, to hold an executive session and only at a regular or special meeting for the sole purpose of the consideration of any of the following matters:**

**(1) To consider the appointment, employment, dismissal, discipline, promotion, demotion, or compensation of a public employee or official, or the investigation of charges or complaints against a public employee, official, licensee, or regulated individual, unless the public employee, official, licensee, or regulated individual requests a public hearing. Except as otherwise provided by law, no public body shall hold an executive session for the discipline of an elected official for conduct related to the performance of the elected official's official duties or for the elected official's removal from office. If a public body holds an executive session pursuant to division (G)(1) of this section, the motion and vote to hold that executive session shall state which one or more of the approved purposes listed in division (G)(1) of this section are the purposes for which the executive session is to be held, but need not include the name of any person to be considered at the meeting.**

**(2) To consider the purchase of property for public purposes \* \* \*.**

**(3) Conferences with an attorney for the public body concerning disputes involving the public body that are the subject of pending or imminent court action;**

**(4) Preparing for, conducting, or reviewing negotiations or bargaining sessions with public employees concerning their compensation or other terms and conditions of their employment.**

**(5) Matters required to be kept confidential by federal law or regulations or state statutes;**

**\* \* \***

**If a public body holds an executive session to consider any of the matters listed in divisions (G)(2) to (7) of this section, the motion and vote to hold that executive session shall state which one or more of the approved matters listed in those divisions are to be considered at the executive session.**

R.C. 121.22(G). "Any case involving R.C. 121.22 is limited to a consideration of whether the conduct of the public body fits one of the narrowly defined exceptions to the rule." *Gannett Satellite Information Network, Inc. v. Chillicothe City School Dist. Bd. Of Edn., et al.*, 41 Ohio App.3d 218, 534 N.E.2d 1239 (4th Dist. 1988).

In this case, the minutes of February 16, 2012, indicate that Appellees entered into executive session to discuss "personnel". Schroeder testified that they were discussing hiring people and restructuring county jobs at a rest home. Schroeder Dep., 100. The language of R.C. 121.22(G)(1), which is the section allowing executive sessions for discussion of hiring and firing people has been held to allow executive session "when its *sole* purpose is the consideration of a *specific* employee's employment, dismissal, etc." *Gannett* at 220. In *Gannett*, the appellate court held that the mere discussion of budget cuts that might result in the termination of some employees positions was not the purpose of the exception under R.C. 121.22(G)(1).[9] The appellate court then held that the trial court erred in holding that the executive session for that purpose did not violate the Sunshine Law, and found a violation of the act to be present. *Id*. at 221. Here, Schroeder testified that they entered into executive session to discuss the restructuring of positions, not necessarily any specific employee. This purpose does not meet one

---

[9] Although the statutory language has changed slightly since *Gannett*, the content is the same.

of the exceptions set forth by statute. Based upon the testimony of the purpose of that executive session, the trial court erred in holding that it was not a violation.

{¶37} Appellants also claim that Appellees violated R.C. 121.22(G) by entering into executive session on April 5, 2012, to discuss economic development. The minutes state as follows.

> **8:30 a.m. – 8:50 a.m.**
>
> **Commissioners Schroeder, Love and Jerwers met with Jeff Loehrke to discuss economic development. Also in attendance was Jack Betscher and Cindy Landwehr. Mr. Jerwers made a motion to go into executive session. Mr. Schroeder seconded the motion. Vote; Mr. Jerwers, yes, Mr. Schroeder, yes, Mr. Love yes.**

Ex. KK. This was confirmed by Schroeder who testified during his deposition that they entered executive session to discuss economic development of a parcel of land. Schroeder Dep., 174-75. Love also testified in his deposition that they entered into executive session on April 15, 2012, to discuss economic development and admitted that this was not permissible under the version of the statute in effect at that time. Love Dep., 17. However, at trial Love testified that the executive session concerned a land swap. Tr. Vol. II, 225. The purpose of economic development was not one of the exceptions permitting an executive session under the applicable version of R.C. 121.22(G). Thus, if that was the purpose, it was not a valid reason. If the purpose was to discuss a land swap, it might be permissible except that the minutes did not comply with the provision of

R.C. 121.22(G) requiring that if the executive session is for a purpose set forth in subsections 2 to 7, "the motion and vote to hold that executive session shall state which one or more of the approved matters listed in those divisions are to be considered" during the session. R.C. 121.22(G). The minutes do not show that the purpose is for any specific reason under subsections 2 to 7, but instead merely state "economic development." The failure to comply with the requirements to enter executive session violates the Sunshine Law.

{¶38} "Upon proof of a violation * * * in an action brought by any person, the court of common pleas SHALL issue an injunction to compel the members of the public body to comply with its provisions." R.C. 121.22(I)(1) (emphasis added). "Irreparable harm and prejudice to the party that sought the injunction shall be conclusively and irrebuttably presumed upon proof of a violation * * * of this section." R.C. 121.22(I)(3). Given the mandates of the statute, the trial court erred by finding that no violation had occurred and by denying the request for an injunction. *See Doran I* and *Doran II*, *supra.* "Because the statute clearly provides that an injunction is to be issued upon finding a violation of the Sunshine Law, it is irrelevant that the [public body has] nullified their prior action." *McVey v. Carthage Twp. Trustees,* 5th Dist. Athens No. 04CA44, 2005-Ohio-2869, ¶9. Thus, Appellees argument that an injunction should be denied because they have passed new resolutions creating policies for notice and minutes is not well taken.

The first and second assignments of error are sustained. The matter needs to be returned to the trial court for a determination of damages pursuant to R.C. 121.22(I)(2)(a).

**{¶39}** In the third assignment of error, Appellants argue that the trial court erred by failing to invalidate resolutions adopted when the statute was violated. Having determined that the trial court erred by failing to issue the injunction, the next issue raised is what the remedy should be. The statute provides that a "resolution, rule or formal action of any kind is invalid unless adopted in an open meeting of the public body." R.C. 121.22(H). Thus any resolution adopted without reasonable notice to the public and without specific notice to those who requested the notice would be invalid. This court has previously held that the failure to comply with the requirements of R.C. 121.22(F) does not automatically invalidate all actions. *Swickrath & Sons, Inc. v. Village of Elida*, 3d Dist. Allen No. 1-03-46, 2003-Ohio-6288. "[T]he purpose of R.C. 121.22(H) is to invalidate those actions taken by a board where insufficient notice was given to the public regarding the meeting." *Doran I, supra* at ¶11. Thus a determination must be made as to which, if any, meetings involved insufficient notice. This determination requires a court to make findings of fact. Fact finding is not the province of this court, but rather is a task left to the trial court. Since the trial court erred in finding no violation, it did not address this question. This question

has yet to be answered and will be left for determination by the trial court upon remand. The third assignment of error is sustained in that this court has previously determined that notice was not sufficiently provided at all meetings. Thus we must remand the issue to the trial court for review and additional findings of fact.

{¶40} Appellants argue in the fourth assignment that the trial court erred in determining that the easement records were lost or destroyed when Appellees set forth no evidence that the records ever existed. The right of way in question was presumed pursuant to R.C. 2729.13.

> **As to every county road the records of which have been lost or destroyed, and which records are not reproduced under section 2729.09 to 2729.12, inclusive, of the Revised Code, the center of the road as fenced on April 12, 1884, is prima facie the true center, and the width of such road is prima facie sixty feet.**

R.C. 2729.13. The record indicates that there was no record of a right of way for a portion of County Road 5, though other portions did have a recorded right of way. The County eventually passed a resolution declaring that there was a presumed right of way pursuant to R.C. 2729.13. Appellants claim that this was an error since at no point in time was any evidence presented that the records ever existed. Appellees argue in their brief that this court should not address this argument because it was not raised in the complaint. A review of the record indicates that this claim was not raised in the initial or amended complaint. Thus, it was not properly before the trial court and Appellees argue that it should not be addressed

by this court. This argument might be persuasive except that this issue was argued before the trial court and the trial court issued a ruling on it. Doc. 106, 18-19. Appellate courts have jurisdiction to review the final orders of inferior courts within their districts. Section 3(B)(2), Article IV, Ohio Constitution; R.C. 2501.02. Since the trial court made a specific ruling that there was evidence that the records were lost or destroyed, this court has the authority to review that decision.

{¶41} A review of the record in this case reveals that at no time did Appellants state a claim arguing against the presumption of a right of way and requesting monetary damages. The basis for the complaint was the violation of the Sunshine Act, violations of the appropriation statutes, and a request for declaratory judgment granting an injunction. The issue of whether Appellees took the additional right of way without compensating the owners for the property is not addressed in the complaint.

{¶42} In addition, this case would not be the appropriate forum for such a challenge to occur. The proper forum for that issue would be in the appropriations case which would have been filed by Appellees in order to obtain the property in dispute. That is the case in which the value and extent of the property being taken by the county should be determined, not the one before us. See R.C. 307.08. The trial court erred in determining in this case that the right of way could be presumed pursuant to R.C. 2729.13 as the issue must be raised in the other case filed

specifically for that purpose.[10]  For this reason, the fourth assignment of error is sustained.

{¶43} In the fifth assignment of error, Appellants claim that the trial court erred in finding that the Board validly authorized the widening of County Road 5. The Board in this case initially passed a resolution to appropriate property from Appellants on February 24, 2012.  The resolution was passed under the authority of R.C. 163.  The Board then passed another resolution to appropriate the same property on April 5, 2012.  The second resolution was passed after questions of notice were raised concerning the February resolution.  Thus, the Board held a special meeting on April 5, 2012, with notice given to many landowners and to the press.  The second resolution was also passed pursuant to the authority of R.C. 163.  The first two resolutions to appropriate the property were filed before the Board passed a resolution finding that the widening of Road 5 was necessary and was for the public convenience and welfare.  A resolution making this finding was not passed until July 12, 2012.  After that resolution was passed, the Board passed a third resolution to appropriate the property, but this time did so pursuant to R.C. 5553.Appellants argue that the resolution should have been passed pursuant to R.C. 5555 and have complied with the requirements of that statutory chapter.

---

[10] This court will not address the issue of whether the right of way can be presumed under the statute as the evidence did not discuss whether the "center of the road as fenced on April 12, 1884" was the same as the current road or if the road even existed on that date.

{**¶44**} The Board is a government organization that is "authorized by law to appropriate property in the courts" and is thus a "Public Agency" by definition. R.C. 163.01(A). However, R.C. Chapter 163 does not grant the authority to appropriate property, but rather sets forth the procedures for doing so. R.C. 163.01 et seq. The authority to appropriate the property must be granted by a different statute.

{**¶45**} The Board may improve or repair any existing public road or part of an existing public road by widening it. R.C. 5555.02. In order to do so, the board must comply with the requirements of R.C. 5555.07.

> **The county engineer shall prepare and file with the board of county commissioners, by the time fixed therefor by the board, copies of the surveys, plans, profiles, cross sections, estimates of costs, and specifications for the improvement and estimated assessments upon lands benefited thereby. Thereupon such board shall file such copies in its office for the inspection and examination of all persons interested. Except in a case involving the improvement of a public road in which no land or property is taken or assessed, the board shall publish in a newspaper published and of general circulation in the county, or if no newspaper is published in the county then in a newspaper having general circulation in the county, for the period of two weeks, notice that a resolution has been adopted providing for said improvement, and that copies of the surveys, plans, profiles, cross sections, estimates, and specifications, together with estimated assessments upon the lands benefited by such improvement for the proportion of the cost thereof to be assessed therefor, are on file in the office of the board for the inspection of persons interested therein. Such notice shall state the time and place for hearing objections to said improvement and to such estimated assessments. * * ***

> **At such hearing, the board may order said surveys, plans, profiles, cross sections, estimates, and specifications to be changed or modified and shall make such adjustments of the estimated assessments as seem just to it.  Thereupon the board may approve such surveys, plans, profiles, cross sections, specifications, and estimates and approve and confirm estimated assessments as made by the engineer or as modified and changed by the board. \* \* \***

R.C. 5555.07.  The authority to appropriate the necessary property is provided by

R.C. 5555.09.

> **If the surveys, plans, profiles, and cross sections prepared by the county engineer pursuant to section 5555.07   of the Revised Code show that lands will be required for the improvement, the board of county commissioners shall proceed in accordance with sections 163.01 to 163.22 inclusive, of the Revised Code.**

R.C. 5555.09

{¶46} In addition to Chapter 5555, Chapter 5553 also covers the alteration of county roads.  The widening of a county road is included in the definition of a road improvement.  R.C. 5553.01.  R.C. 5553.02 grants the authority to the board of county commissioners to widen county roads.

> **When the board of county commissioners is of the opinion that it will be for the public convenience or welfare to \* \* \* widen \* \* \* a public road, it shall so declare by resolution, which resolution shall set forth the \* \* \* general manner in which the road is to be \* \* \* widened \* \* \*. \* \* \***

R.C. 5553.04.

> **(D)  In the resolution required by section 5553.04 of the Revised Code, the board of county commissions shall fix a date when it**

**will view the proposed improvements, and also a date for a final hearing thereon.**

**The board shall give notice of the time and place for both such review and hearing by publication once a week for two consecutive weeks in a newspaper published and having general circulation in the county where such improvement is located, but if there is no such newspaper published in said county, then in a newspaper having general circulation in said county. Such notice, in addition to the date and place of such view and place and time of the final hearing, shall state briefly the character of such improvement.**

R.C. 5553.05.

**If the board of county commissioners, after viewing the proposed improvement, considers such improvement of sufficient public importance, it shall instruct the county engineer to make an accurate survey and plat of such improvement and furnish an accurate and detailed description describing therein, the center line and right of way lines. The engineer shall also furnish an accurate and detailed description of each tract of land which he believes it is necessary to take in the event such improvement is made, together with the name of each owner The engineer shall, at the time of making such survey, set stakes at the termini of each right of way line, at all angles between such termini, and at sufficient other points on the right of way lines so that the bounds of such improvement are discernable to property owners and other interested persons. The engineer shall make a report in writing to the board on or before the date fixed for the final hearing. Such report shall set forth the opinion of the engineer for or against such improvement. * * ***

R.C. 5553.06

**The board of county commissioners shall at the date of the final hearing on the proposed improvement read the report of the county engineer, and it shall hear any testimony bearing upon the necessity of the improvement for the public convenience or**

**welfare and offered either for or against proceeding with the improvement by any interested persons.**

**If the board finds such improvement will serve the public convenience and welfare, it shall by resolution enter such finding on its journal and determine to proceed with the improvement. If it finds such improvement will not serve the public convenience and welfare, it shall refuse to proceed with the improvement.**

R.C. 5553.07.

**When, on the final hearing on the proposed improvement, the board of county commissioners finds in favor of such improvement, and determines to proceed therewith, it shall cause a record of the proceedings, including the survey, plat, and accurate and detailed description of such improvement, to be entered forthwith in the proper road records of the county by the county engineer.**

**\* \* \* If the proceeding is for the \* \* \* widening \* \* \* of a road, the board shall make the necessary order to accomplish such purpose. \* \* \***

**No road shall be opened or property taken until all compensation and damages allowed are paid, or the amount thereof, as allowed in accordance with sections 163.01 to 163.22, inclusive, of the Revised Code.**

R.C. 5553.10.

**If the proceeding is for an improvement other than the vacation of a road and the board of county commissioners, at its final hearing on the proposed improvement, orders the improvement established, it shall proceed in accordance with sections 163.01 to 163.22 of the Revised Code.**

R.C. 5553.11.  A review of all the previous statutes, especially R.C. 5553.11,

clearly indicates that the above steps should be taken prior to the appropriation of

property. Unfortunately, that is not what happened in this case. Here, the land was appropriated on April 5, 2012, but the resolution to widen the road was not passed until July 26, 2012. This raises the issue of whether this failure to follow the steps in order means that the project cannot progress.

{¶47} Appellants essentially raise three issues related to the fifth assignment of error. The first issue is whether Appellees pursuant to R.C. 163 had the authority to file appropriation proceedings. The answer to this question is no. The statute does not grant the authority, but instead sets forth the procedures for doing so. It also limits the use of the authority to only the takings that are necessary and for public use. The authority of the Board to appropriate property is not unlimited. A review of Chapter 307 of the Revised Code, which sets forth the powers of boards of county commissioners, does not provide the boards with the authority to appropriate lands for the widening of roads. See R.C. 307.08. The authority to do this comes from Chapters 5553 and Chapters 5555 of the Revised Code, as set forth above.

> **"Statutes relating to the same matter or subject, although passed at different times and making no reference to each other, are in pari materia and should be read together to ascertain and effectuate if possible the legislative intent."** *State ex rel. Pratt v. Weygandt* **(1956), 164 Ohio St. 463, 58 O.O. 315, 132 N.E.2d 191, paragraph two of the syllabus. Further, in reading such statutes and construing them together, we must arrive at a reasonable construction giving the proper force and effect, if possible, to each statute.** *Maxfield v. Brooks* **(1924), 110 Ohio St. 566, 144 N.E. 725, paragraph two of the syllabus.**

*D.A.B.E., Inc. v. Toledo-Lucas Cty. Bd. Of Health*, 96 Ohio St.3d 250, 2002-Ohio-4172, ¶20, 773 N.E.2d 536.

**{¶48}** The record in this case shows that prior to the appropriation of the property pursuant to R.C. 163 et seq., on April 5, 2012, Appellees had not complied with the requirements of R.C. 5553.04 et seq. or R.C. 5555.07. The evidence is undisputed that as of April 5, 2012, there was no resolution in place finding that the widening of the road was necessary and was for the public convenience and welfare as is required by R.C. 5553.07. R.C. 5553.11 provides that the Board may proceed pursuant to the procedures set forth in Chapter 163 to appropriate property after it has held the final hearing and "ordered the improvement established". The evidence presented in this case is that Appellees proceeded with the appropriation before obtaining the necessary plans, providing the two weeks of notice to the general public, holding the necessary hearings, and passing the necessary resolution as set forth in Chapter 5553. Thus, the Board did not comply with the statutory requirements of R.C. 5553.

**{¶49}** The second issue raised by Appellants is whether R.C. 5553.04 requires a petition by freeholders. The answer to that question is no. The statute specifically provides that the board of county commissioners may, in its own opinion, determine that a road should be widened for the public convenience or welfare. R.C. 5553.04. If the commissioners so decide, they can declare it by

resolution. *Id.* The state also provides a method, by a petition "signed by at least twelve freeholders of the county residing in the vicinity of the proposed improvement" for the citizens of the county to raise the issue with the board and requires the board to address the issue when the petition is filed. *Id.* However, the statute does not mandate that there be a petition and specifically provides for the improvement to proceed under a resolution of the board.

{¶50} Finally, Appellants question whether the resolution approving the improvement needs to be unanimous. The answer to this question is yes. A review of the statute which was used by the Board to pass the resolution in July 2012 indicates that it imposes no requirement that the resolution be approved by unanimous vote. R.C. Chapter 5553.04. However, a review of R.C. 5555.06 provides that "[t]he board of county commissioners may by resolution adopted by a unanimous vote find that the public convenience and welfare require the improving of any public road or part thereof by * * * widening such road and constructing or reconstructing any bridges and culverts necessary for such improvement." R.C. 5555.06. As stated above, the two statutes must be read together and interpreted in a manner which will give both effect. "It is a well settled rule of statutory construction that where a statute couched in general terms conflicts with a specific statute on the same subject, the latter must control." *Humphrys v. Winous Co.*, 165 Ohio St. 45, 48, 133 N.E.2d 780 (1956). R.C.

5553.04 is silent as to whether the vote must be unanimous, but addresses the procedure for establishing, altering, or vacating a road. R.C. 5555.06 addresses resolutions by the board for county road improvements and specifically states that the vote must be unanimous. As one statute is silent and one is more specific as to the votes, this court must interpret the statutes to require that the constraints of the more specific statute be met.

{¶51} The Ohio Attorney General released an opinion in 1930 addressing how the predecessors of the current statutes work together. That opinion stated that commissioners may, by a unanimous vote, without a petition locate or establish a road within the county. 1930 Ohio Atty.Gen.Ops. No. 2121. Although the Attorney General's opinion reviewed the prior sections of the General Code, the language of the Revised Code in effect at the relevant time, when the alleged violations occurred, was nearly identical. Also reviewing the language of the prior statute, which eventually became R.C. 5555.06, the First District Court of Appeals[11] held that the statute requires that if there is no petition from the public, the statute mandates that the initial resolution to improve the road be passed by unanimous consent. *Thomas v. Bd. of Commrs. of Butler Cty.*, 28 Ohio App. 8, 162 N.E. 430 (1ˢᵗ Dist. 1923). Reading the relevant sections of the statute in conjunction with each other and giving effect to all sections, it would appear that

---

[11] The case arose out of Butler County which was part of the first district, but is now part of the twelfth district.

the initial resolution finding that the widening of the road was for the public convenience or welfare required a unanimous vote in the absence of a public petition. Thus, the trial court erred in holding that no unanimous vote was required.

{¶52} Appellees argue that the appeal on this issue is precluded by Revised Code Chapter 5563 which governs appeals in county road cases.

> **No order of the board of county commissioners for \* \* \* widening \* \* \* a public road shall be executed until ten days have elapsed after the board has made its final order in the matter of compensation and damages, on account of such improvement. If, at the end of ten days, any person, firm, or corporation interested, has affected an appeal, then the order shall not be executed until the matters appealed from have been disposed of in the probate court or the common pleas court.**

R.C. 5563.01. Appellees claim that we should dismiss the appeal because no such appeal was filed. However, a review of the record indicates that Appellees had not proceeded in the statutory manner for the Road 5 project and had begun appropriating property several months before passing the resolution to widen the road. Appellants had already filed objections with the common pleas court. One of the claims listed in the complaint was that Appellees had failed to comply with the statutory requirements for widening a road. Since an action was already pending regarding these issues, what was to be gained by the filing of a new action? Additionally, Appellees did not raise this issue before the trial court and

the trial court did not address it. The issue will not be addressed for the first time on appeal.

{¶49} Having found that Appellees failed to comply with the statutory requirements when authorizing the widening of County Road 5, the fifth assignment of error is sustained. This then raises the problem of what the proper remedy is, since the injunction was denied and the road has already been widened. Clearly the question of an injunction to prohibit the widening of County Road 5 is now moot and no one has requested that the road be returned to its original width.[12] This issue must be remanded to the trial court for a determination of the appropriate remedy.

{¶50} In the sixth assignment of error, Appellants allege that the trial court erred by allowing Appellees to pass the resolution to widen the road after beginning eminent domain proceedings. This court has previously determined that the resolution was not properly enacted. Thus the question of the effect of that resolution on prior actions is moot and need not be addressed by this court. App.R. 12(A)(1)(c).

---

[12] We are not suggesting that such an event should occur as doing so would be a tremendous waste of public resources. This is especially true since the commissioners have the authority to widen the road as long as they do so pursuant to the correct procedures.

{¶51} Having found error prejudicial to the Appellants, the judgment of the Court of Common Pleas of Putnam County is reversed and the matter is remanded for further proceedings in accord with this opinion.

*Judgment Reversed and*
*Cause Remanded*

**ROGERS and SHAW, J.J., concur.**

**/jlr**